[No. 21979–1–I. Division One. October 2, 1989.]

*In the Matter of the Dependency of* C.A.

THE STATE OF WASHINGTON, *Respondent,* v. PATRICIA ARNOLD, *Appellant.*

*Andrew P. Zinner* of *Washington Appellate Defender Association,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Trisha McArdle, Assistant,* for respondent.

SWANSON, J.—Patricia Arnold appeals from an order terminating parental rights in her daughter C, born November 21, 1985. Among other things, Arnold challenges the sufficiency of the evidence.

Prior to C's birth in November 1985, Arnold experienced a series of personal difficulties: she was raped twice, evicted and threatened with eviction several times, and arrested for shoplifting. Arnold had ongoing conflicts with her sisters Julie and Donna, who lived with her at various times. Throughout 1985, Arnold participated in therapy, counseling, and parenting classes. R, C's older sister, was found to be dependent pursuant to an agreed order of dependency entered January 22, 1985.

Following C's birth in November 1985, Arnold continued to experience conflicts with her sisters who, among other things, stole Arnold's rent money. Arnold voluntarily placed C into foster care from February 28, 1986, to March 21, 1986, to deal with "a cockroach problem in her apartment." Arnold was evicted again in April 1986. C was next placed into foster care from July 22, 1986, to August 1, 1986, while Arnold served a jail sentence for shoplifting. Between December 1985 and May 1986, Arnold received individual counseling, parenting assistance, and services from a public health nurse and homemaker.

On December 12, 1986, R and C were placed into foster care following the filing of a dependency petition on C. After a hearing on February 24, 1987, the trial court found C to be dependent pursuant to RCW 13.34.030(2)(c)[1] and found the following allegations, among others, to be true:

c. The mother has been diagnosed borderline personality syndrome and has been hospitalized twice for psychiatric problems.

d. The mother has been arrested three times for shoplifting and once for assault. She has been raped twice.

---

[1]RCW 13.34.030(2)(c) defines a dependent child as one who "has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development . . ."

e. On November 13, 1986, a member of the mother's church called CPS to report the mother telling her and other church members that [R] was hurting [C]. This consisted of tipping [C] over in her stroller and pushing her out of bed. On both occasions, [C] sustained head bruises.

f. Between November 18, 1986, and December 10, 1986, CPS received calls from Children's Services, Family Counseling, Dr. Naomi Katsh, and the mother herself reporting accidents occurring to the children. These accidents included the following: 1) In November, 1986, [R] was treated at Everett General Hospital for having placed a spoon in her mouth which contained a liquid drain cleaner; 2) On November 29, 1986, the mother, having been mad at her sister, walked into her bedroom and threw her keys in frustration. The keys accidentally hit [C] in the forehead which required her to be treated at Everett General Hospital; 3) On December 8, 1986, [R], being mad at her mother, tipped over a lamp. The exposed light bulb burned [C's] face. The burn covered approximately a four inch area on her left cheek near her mouth.

The dispositional order provided that Arnold was to complete parenting classes and counseling and was to maintain a "stable home and lifestyle for . . . at least five months."

C was returned to Arnold on June 4, 1987, but placed into foster care once again on July 8, 1987, when Arnold permitted a man to stay in her home who she knew had physically and sexually abused his stepdaughter. This man may also have burned C with a cigarette. At the July 14, 1987, dependency review hearing, C was returned to her mother on condition that she not permit men "not authorized by DSHS" into her home.

The Department of Social and Health Services (DSHS) filed a termination petition regarding C on October 13, 1987. Following a fact–finding hearing on January 13–15, 1987, the trial court terminated Arnold's parental rights in both C and R. This appeal ensued.

In support of the termination petition, Julie Nagel, a child and family therapist for Children's Services in Everett, testified that she began seeing Arnold and R in November 1986 and C in March 1987. Nagel emphasized Arnold's inability to supervise her children and her lack of judgment in having "inappropriate men" in her house.

Although Nagel characterized Arnold's participation in services as exemplary, she was not satisfied with Arnold's progress, in particular, with Arnold's inability to apply skills and techniques learned in the classroom to actual living situations. Nagel found that these deficiencies resulted in a continuing threat to the safety of Arnold's children. In Nagel's opinion, C required a permanent living situation and termination was in her best interests.

Katherine Day, a clinical psychologist, evaluated R and Arnold in 1985 and again in July 1987. In 1987, Day detected no indication of Arnold's earlier problems with anger, but concluded that Arnold suffered from a "schizoid personality disorder" and from an "aggressively negative world view." According to Day, people with this "profile" have great difficulty in resisting impulsive urges in order to achieve greater goals and in establishing routines necessary for effective parenting. In Day's opinion, Arnold was incapable of providing the continuity necessary to parent C effectively. Day offered no opinion whether Arnold might be able to provide such continuity in the "distant future" and concluded that termination was "probably" in the children's best interest.

Jean Markham, a DSHS caseworker for R since April 1985 and for C since November 1987, testified that Arnold's continued problems with her relatives, her difficulty in maintaining a stable residence, and the frequent accidents that occurred while the children were in her custody all reflected Arnold's inability to provide a safe environment for her children. Markham described a visit with Arnold, R, and C in early September 1987:

> We were in an interview room, [R] was attacking [C] during the time that we were talking, she rammed the stroller into the wall, she was grabbing [C] by the front of her clothes and shaking her and was hitting her. Patty seemed to be totally oblivious to what was going on, and . . . I had to intervene.

Markham opined that termination was necessary because:

> Patty has been offered and provided more services in the past four years than any parent I've ever had on my case load, and progress has been minimal, if any, and her ability to parent

and protect her children. Her judgment remains gravely impaired causing her to place herself and her children repeatedly in danger. In many ways she seems unable to learn from her mistakes, and I think that she is unable to place the needs of her children ahead of her own. These are the same concerns, the same concerns I have now that I had when I started working with Patty almost three years ago.

Markham stated that continued foster placement for both children would be emotionally damaging with no reasonable hope that Arnold could ever resume parenting.

Testimony essentially similar to Markham's was presented by several additional witnesses. All of the State's witnesses acknowledged Arnold's cooperation and willingness to utilize services, but noted her minimal progress over the course of some 4 years.

Several witnesses testified on Arnold's behalf. Sharla Starr, a member of Arnold's church, testified that she had known Arnold for about 5 years and that she "did well" as a parent. Starr also stated that Arnold had done her best to distance herself from her family. Jean Harrell and Janna Rachey, bus drivers for the City of Everett, testified that they had frequently seen Arnold interacting with her children while on the bus and that Arnold had always responded appropriately.

Kendra Weber, also an Everett bus driver, testified that she had been Arnold's roommate since October 1987. Weber described Arnold as a capable parent who exercised appropriate discipline and control. Weber stated that Arnold had recognized the problems caused by her family and was separating herself from them. Weber related that Arnold had started school and was doing well. All of Arnold's witnesses felt that the only services she might need in the future would be daycare.

## STANDARD OF REVIEW

Prior to entering an order terminating parental rights, the trial court must find (1) that the allegations set forth in RCW 13.34.180(1) through (6) have been established by

"clear, cogent, and convincing evidence" and (2) that termination is in the best interests of the child. RCW 13.34-.190(1), (2). RCW 13.34.180 enumerates the following facts that must be alleged and proved in a termination hearing:

> (1) That the child has been found to be a dependent child under RCW 13.34.030(2); and
> (2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and
> (3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency under RCW 13.34.030(2); and
> (4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and
> (5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and
> (6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home[.]

The trial court's findings on the requirements of RCW 13.34.180 must be upheld if they are supported by "clear, cogent, and convincing" evidence. *In re Ramquist,* 52 Wn. App. 854, 860, 765 P.2d 30 (1988), *review denied,* 112 Wn.2d 1006 (1989).

Arnold initially challenges the sufficiency of the evidence supporting RCW 13.34.180(3), which requires that prior to termination, a child must have been removed from parental custody "for a period of at least six months pursuant to a finding of dependency . . ." Without citation to relevant authority, Arnold maintains that this provision must be construed to require an uninterrupted 6–month period of removal prior to termination. Here, C was removed from her mother's custody for more than 6 months but not for any continuous 6–month period. Arnold argues that "period" must mean "continuous period" in order to provide a parent with a sufficient opportunity, prior to termination, to rectify the conditions that prompted removal.

Arnold reasons that such a construction serves to prevent hasty terminations. We disagree.

In RCW 13.34.020, the Legislature declared its policy in favor of nurturing and protecting the family unit. The Legislature also declared, however, that

[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail.

The requirements of RCW 13.34.180 and .190 must be construed in light of these purposes.

In order to terminate parental rights, the trial court must find, by clear, cogent, and convincing evidence, that all necessary services reasonably available and capable of correcting parental deficiencies within the *foreseeable future* have been offered or provided and that there is little likelihood that conditions will be remedied so that the child can return to the parent in the *near future*. RCW 13.34.180(4), (5). These requirements serve to prevent the "hasty" terminations feared by appellant.

 To construe RCW 13.34.180(3) to require a continuous 6–month period of removal, as the trial court observed, would tend to discourage attempts by DSHS, such as occurred here, to return a child to the parent's custody. Once a child has been removed from parental custody for a total of 6 months, and the remaining requirements of RCW 13.34.180 and RCW 13.34.190 can be established, no further delay in termination should be required. Construing RCW 13.34.180(3) to provide for a total period of 6 months fosters a flexible approach toward removal, an approach that, in conjunction with the additional requirements of RCW 13.34.180 and .190, serves to promote, not hinder, retention of the family unit. Such a construction also serves the legislative goal of protecting the child's best interests. *Cf. In re Esgate*, 99 Wn.2d 210, 214, 660 P.2d 758 (1983). Appellant's construction would impose a potentially arbitrary 6–month waiting period that could increase the already harmful effects of termination on the child without furthering in any meaningful fashion the policy favoring the family unit.

The remaining issues, having no precedential value, will not be published. *See* RCW 2.06.040.

Affirmed.

FORREST, J., and REVELLE, J. Pro Tem., concur.